UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
APR 15 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

SUNSET HOMEOWNERS ASSOCIATION,
INC. and GLENN ARTHURS,

          Plaintiffs,

   v.

NATASCHA DIFRANCESCO and BRYAN
DIFRANCESCO,

          Defendants.

**DECISION AND ORDER**

1:19-CV-00016 EAW

## INTRODUCTION

Plaintiffs Sunset Homeowners Association, Inc. (the "Sunset HOA" or the "Association") and Glenn Arthurs ("Arthurs") (collectively, "Plaintiffs") commenced this action in New York State Supreme Court, Cattaraugus County, on December 4, 2018, alleging that Natascha DiFrancesco and Bryan DiFrancesco (collectively, "Defendants") breached their contractual obligations by advertising and utilizing their properties as rental units through Airbnb, Inc., and HomeAway, Inc. (Dkt. 1-2 at 4-18).[1] Plaintiffs also obtained a temporary restraining order in state court that, among other things, prohibited the use of Defendants' properties for rental purposes. (Dkt. 1-3 at 1-4). On January 3, 2019, Defendants removed this action to federal court. (Dkt. 1).

Presently before the Court is Plaintiffs' motion for a preliminary injunction (Dkt. 1-3 at 5-184) and Defendants' motion to dismiss (Dkt. 3). For the following reasons, the

---

[1] Airbnb, Inc. and HomeAway Inc. were originally named as defendants to this action but have since been voluntarily dismissed. (Dkt. 1-3 at 185, 191).

Court denies Defendants' motion to dismiss, in part, to the extent it is based on a lack of standing. The Court holds Defendants' remaining arguments in abeyance along with Plaintiffs' motion for a preliminary injunction until both sides have had the opportunity to submit further briefing as instructed below.

## BACKGROUND[2]

Defendants are citizens of Ontario, Canada (Dkt. 1 at ¶¶ 3-4 (Notice of Removal)) and homeowners of two properties on Sunset Road, Ellicottville, New York (Dkt. 1-2 at 5). While Natascha purchased both properties at issue (Dkt. 3-8 at ¶ 4 (Bryan's Affidavit); Dkt. 3-12 at ¶¶ 4-5 (Natascha's Affidavit)), Plaintiffs allege that she "shares common law ownership" of these properties with her husband, Bryan (Dkt. 1-2 at 5). These lots fall under the purview of the Sunset HOA, which "oversees the administration and governance of the Sunset Area Subdivision of Holimont within the Town of Ellicottville, New York." (*Id.*). One of the primary purposes of the Association is to "ensure the creation and promotion of an attractive well-built and well-maintained community of private homes" within the subdivision. (*Id.* at 7). As a result, subdivision homeowners become members of the Sunset HOA and are subject to certain restrictive covenants. (*Id.*).

Plaintiffs allege that, beginning on or about May 2018, Defendants "began advertising their Ellicottville properties, including the subject properties on Sunset Road, for short-term lease through a local real estate broker and property manager, and on websites such as VRBO.com and Airbub.com, among others." (*Id.* at 9). Accordingly,

---

[2] The following facts are taken from Plaintiffs' Verified Complaint (Dkt. 1-2 at 4-18) unless otherwise indicated and assumed to be true for purposes of this motion.

Plaintiffs claim that Defendants' alleged "rental activity" violated their obligations under the restrictive covenants, which "prohibit any type of business or commercial enterprise, and which permit only private and non-commercial use of their Sunset Road properties." (*Id.* at 10). Because Defendants have leased their property to "transient tenants" without the consent of the Sunset HOA Board of Directors, Plaintiffs have allegedly violated these restrictive covenants. (*Id.* at 10-11).

Plaintiffs further allege that the Sunset HOA, acting through its President, Jeffrey Zaffino ("Zaffino"), informed Defendants of their purported noncompliance throughout the Summer of 2018 and sought to enforce these obligations. (*See id.* at 11-12). Despite his attempts, Defendants allegedly ignored the Sunset HOA's requests to cease further advertising of their properties for rental and/or commercial activities. (*Id.* at 12).

## PROCEDURAL HISTORY

On or about December 4, 2018, Plaintiffs filed a Summons and Verified Complaint with the New York State Supreme Court, County of Cattaraugus, alleging, among other things, causes of action for breach of contract and seeking a preliminary injunction enjoining Defendants from continuing to use their properties in contravention of the restrictive covenants. (*See* Dkt. 1-2 at 2-18). On December 13, 2018, the state court issued an order to show cause containing a temporary restraining order that restricted Defendants' use of their property. (*See* Dkt. 1-3 at 1-4). The state court subsequently issued a supplemental order to show cause on December 24, 2018, that carved out several exceptions to the prohibited rental activity in order to accommodate for the holiday season until the preliminary injunction hearing scheduled for January 17, 2019. (*Id.* at 186-90).

Defendants removed the action to federal court on January 3, 2019 (Dkt. 1)—before the disposition of the preliminary injunction motion—and filed a motion to dismiss and a motion to vacate the temporary restraining order on the same day (Dkt. 3). Because the temporary restraining order expired 14 days after the action was removed (*see* Dkt. 7), on January 18, 2019, Plaintiffs filed a cross motion for a temporary restraining order (Dkt. 8) and requested an expedited hearing on that motion (Dkt. 9).

At a telephone conference held on January 22, 2019, the Court denied Plaintiffs' cross motion for a temporary restraining order and scheduled a motion hearing on Defendants' motion to dismiss and Plaintiffs' still pending motion for a preliminary injunction. (Dkt. 13). On January 31, 2019, the Court held oral argument and reserved decision. (Dkt. 22).

## DISCUSSION

### I.    Plaintiffs Have Standing to Bring this Suit

"A plaintiff's constitutional standing is a jurisdictional matter and, as such, requires examination when called into question." *Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535, 551 n.7 (W.D.N.Y. 2018). Accordingly, the Court will address Defendants' standing arguments before turning to whether service was properly effectuated. *See Elkind v. Revlon Consumer Prod. Corp.*, No. 14-CV-2484 JS AKT, 2015 WL 2344134, at *3 (E.D.N.Y. May 14, 2015) ("Because standing is a jurisdictional matter, the Court considers those arguments before considering the merits of Defendant's motion to dismiss." (citation omitted)).

## A.    Legal Standard

To establish standing under Article III of the United States Constitution, "a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). A plaintiff must have standing as to every claim for relief alleged, including requests for injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). As the Second Circuit has explained:

> In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct. In doing this, he cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future.

*Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quotations and citations omitted); *see Laidlaw*, 528 U.S. at 191 ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.").

## B. Plaintiff Arthurs has Standing to Bring this Suit

Pursuant to New York law, "when an owner of a large tract of land divides it into lots to be sold to different purchasers by deeds containing uniform covenants restricting the use which the grantees may make of their premises, the covenants are enforceable by any grantee as against any other." *Beacon Syracuse Assocs. v. City of Syracuse*, 560 F. Supp. 188, 196 (N.D.N.Y. 1983). The restrictive covenants apply to the subject lots in the Sunset HOA subdivision (Dkt. 1-2 at 20), and were intended to assist the Sunset HOA in promoting "the creation of an attractive well-built and well-maintained community of private homes. . . ." (*id.*; *see id.* at 28 (stating that the "covenants, conditions and restrictions . . . are for the purpose of protecting and enhancing the value, desirability and attractiveness" of the properties)). To this end, the covenants restricted the landowners from putting their properties to certain delineated uses in order to ensure that the character of the neighborhood was developed and maintained as a residential community. Moreover, the restrictive covenants included enforcement provisions that provided that such covenants:

> shall bind and inure to the benefit of and be enforceable by the Corporation *or by the owner or owners of any of said property* and it shall be lawful not only for the Corporation, but *also for the owner of any said plots or lots* to institute and prosecute any proceedings at law or in equity against any person, firm or corporation violating or threatening to violate any of the conditions, restrictions or covenants herein contained. . . .

(*Id.* at 24 (emphases added); *see also id.* at 32 (providing that the "Association, *or any owner*, shall have the right to enforce, by any proceeding at law or in equity, all of the

restrictions, covenants, conditions, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration" (emphasis added))).

A review of the restrictive covenants reveals that they "are part of a common development scheme created for the benefit of all property owners" in the Sunset HOA subdivision, and thus, Arthurs, as a property owner in that subdivision (Dkt. 1-3 at 162), "has standing to enforce the restrictive covenants against any other individual property owner within the development," *Dever v. DeVito*, 84 A.D.3d 1539, 1540 (3d Dep't 2011). Given the express language granting each landowner in the subdivision the authority to seek remedies at law and in equity for the violation of the covenants by another landowner within the development, Arthurs has standing to sue Defendants for allegedly violating the restrictive covenants encumbering their properties. Therefore, Defendants' argument that Arthurs lacks standing to bring this suit is without merit.

### C. The Sunset HOA has Standing to Bring this Suit

"An organization can have standing to sue in one of two ways. It may sue on behalf of its members, in which case it must show, *inter alia*, that some particular member of the organization would have had standing to bring the suit individually." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). In addition, "an organization may 'have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 608 (E.D.N.Y. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)), *aff'd*, 868 F.3d 104 (2d Cir. 2017). "Under this theory of 'organizational' standing, the organization is just

another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself 'must meet[ ] the same standing test that applies to individuals.'" *N.Y. Civil Liberties Union*, 684 F.3d at 294 (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998)). "The Second Circuit has recognized that when analyzing whether an organization has standing to sue in its own right 'only a perceptible impairment of an organization's activities is necessary for there to be an 'injury in fact.'" *Centro De La Comunidad Hispana De Locust Valley*, 128 F. Supp. 3d at 609 (quoting *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011)).

Here, Defendants contend that the Sunset HOA does not have standing to commence this action because it did not follow the procedures set forth in its bylaws before doing so. (*See* Dkt. 3-13 at 12-13). Specifically, Defendants cite to Article III(c) of the "Supplemental Declaration of Covenants, Conditions and Restrictions of Holimont Sunset Area Subdivision." (Dkt. 1-2 at 28-55). Article III of this supplemental declaration, which expressly pertains to "Membership and Voting Rights," provides that "[a]ll actions of the Association shall be determined as provided by the Bylaws of Sunset Area Association." (*Id.* at 30). Considering this directive appears under the Article designated for membership and voting rights, it is not at all clear whether the "actions of the Association" identified therein include the enforcement of the restrictive covenants. Nonetheless, Defendants rely upon this language in asserting an equally tenuous interpretation of the Sunset HOA's bylaws.

Section four of the Association's bylaws, entitled "Meeting of Members," includes a subsection for "Actions Without a Meeting." (*Id.* at 58). That subsection provides:

- 8 -

> [a]ll action, except removal of a Director, which may be taken at a meeting of the Association, may be taken without a meeting with the approval of, and in writing or writings signed by members having the percentage of voting power required to take such action if the same were taken at a meeting.

(*Id.*). Defendants point to this language in arguing that the Sunset HOA does not have standing to bring this suit without establishing that it consulted with and gained the approval of the Association's Board of Directors or the "broader membership of the Sunset HOA." (Dkt. 3-13 at 12).

The Court rejects Defendants' interpretation of the supplemental declaration and the Association's bylaws. The cited provisions address "membership and voting rights," as well as when certain actions generally pursued during formal meetings may be appropriately executed without a meeting. In other words, Defendants rely upon language having no apparent connection to the enforcement of the restrictive covenants at issue.

Furthermore, Plaintiff's Verified Complaint was signed by Zaffino (Dkt. 1-2 at 17), the Association's President (Dkt. 10-19 at ¶ 1). The Association's bylaws also provide that its President "may execute *all contracts and other obligation* [sic] of the Association and shall have such other authority and shall perform such other duties as may be determined by the Board of Directors or otherwise provided in the Bylaws." (Dkt. 1-2 at 60 (emphasis added)). This provision provides further support for the notion that the Sunset HOA's President is authorized to "execute" the Association's rights and obligations under the restrictive covenants.

Even assuming *arguendo* that the Sunset HOA violated its bylaws by failing to obtain the approval of the Board of Directors prior to initiating this lawsuit, any such

procedural irregularity does not strip the Association of its standing to sue in this case. Under a theory of associational or representational standing,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In examining whether an organization satisfies this standing analysis, "[s]everal courts have found that internal conflicts of interest may be so severe that members of an association may be required to join the action individually in order to protect their own interests." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 251 (S.D.N.Y. 1997); *see Am. Booksellers Ass'n, Inc. v. Random House, Inc.*, No. 96 CIV. 0030 (JFK), 1996 WL 499520, at *6 (S.D.N.Y. Sept. 4, 1996) (stating that "conflict between an association and its members is relevant to determination" of representational standing (quotation omitted)); *Associated Gen. Contractors of Conn., Inc. v. City of New Haven*, 130 F.R.D. 4, 10 (D. Conn. 1990) ("Courts would ordinarily uphold an association's determinations against internal challenge unless it were shown that the organization's internal policies had been violated." (quoting *Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1233 (D.C. Cir. 1987))). Indeed, the Sunset HOA commenced this action against two of its own members. *See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1380 (7th Cir. 1987) (finding that "[t]he alignment of the parties to this action . . . evidences a serious conflict" in the plaintiff organization's interest where several of the named defendants were also members of the plaintiff organization);

*cf. Nat'l Ass'n of Coll. Bookstores, Inc.*, 990 F. Supp. at 251 ("This is not a case in which the association is attempting to sue some of its members on behalf of others."). Thus, if Sunset HOA could only establish standing in a representational capacity, it would likely be appropriate to determine the Association's compliance with its "internal procedures" when it decided to commence this action, and to what extent there is an "actual or potential conflict" of interest between its members. *See, e.g., Nat'l Ass'n of Coll. Bookstores, Inc.*, 990 F. Supp. at 251.

However, the Sunset HOA has standing in its own right to commence this action to enforce its rights and obligations under the restrictive covenants pursuant to a theory of "organizational" standing, as opposed to "associational" or "representative" standing. As discussed above, the Sunset HOA is authorized to seek remedies at law and at equity against any homeowner within the subdivision who violates the restrictive covenants. (*See* Dkt. 1-2 at 24, 32). A violation of the covenants the Association is specifically tasked with enforcing is more than a mere "perceptible impairment" upon its own rights as an organization, *see Centro De La Comunidad Hispana De Locust Valley*, 128 F. Supp. 3d at 609 (quoting *Nnebe*, 644 F.3d at 157), which may be redressed through monetary or injunctive relief. Thus, for substantially similar reasons that Arthurs has standing to commence this action, the Sunset HOA also has standing to bring this suit as an organization.

## II. Whether Service was Sufficiently Effectuated Upon Natascha DiFrancesco is Questionable and Requires Further Briefing

### A. Legal Standard

"A Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or lack of delivery of the summons and complaint." *Jackson v. City of New York*, No. 14-CV-5755 (GBD) (KNF), 2015 WL 4470004, at *4 (S.D.N.Y. June 26, 2015) (quoting 5B C. Wright & A. Miller, Fed. Prac. & Proc. § 1353 (3d ed. 2004)). "[I]n considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). "When a defendant raises a Rule 12(b)(5) 'challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy.'" *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citation omitted).

In their opposition papers, Plaintiffs assert that they effectuated proper service upon both Defendants in three distinct ways: (1) by complying with the state court's initial order to show cause, which required Plaintiffs to serve the order, "together with the papers upon which it is made, . . . by overnight delivery, upon defendants Natascha DiFrancesco and Bryan DiFrancesco, at their office address," and stated that "such service shall be deemed good and sufficient"; (2) by Federal Express overnight delivery to Defendants in Canada; and (3) by hiring a Canadian process server to personally serve Defendants at their place of business. (Dkt. 10 at 9-11). The Court addresses the validity of each attempt to effectuate service in turn.

**B.** **Compliance with the State Court Order Did Not Effectuate Proper Service of the Summons and Verified Complaint**

"Because service was attempted only *before* removal to federal court, the propriety of service must be determined by reference to state law." *Zeballos v. Tan*, No. 06 CIV. 1268 (GEL), 2006 WL 1975995, at *6 (S.D.N.Y. July 10, 2006); *see Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 383 (S.D.N.Y. 2006) ("[F]ederal courts routinely look to state law when evaluating the propriety of service of process in deciding motions to dismiss a complaint in diversity cases removed to federal court."); *see generally* Fed. R. Civ. P. 81(c) (providing that the federal rules "apply to a civil action after it is removed from a state court"). Furthermore, as citizens of Ontario, Canada, Defendants are foreign nationals. Therefore, because "[t]he United States and Canada are both signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters[ (the 'Hague Convention,' or the 'Convention,' or the 'Hague')]," *In re Greater Ministries Int'l, Inc.*, 282 B.R. 496, 499 (Bankr. M.D. Fla. 2002), service must also comport with the Hague Convention, *see Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 706 (1988) ("The Convention provides simple and certain means by which to serve process on a foreign national."); *see also In re Greater Ministries Int'l*, 282 B.R. at 499 ("The purpose of the Hague Convention is to ensure that individuals receive timely notice of judicial/extrajudicial documents, and to provide a simple and expeditious method for providing notice of a proceeding to a foreign citizen or corporation.").

"Article 10 of the Hague Convention states that '[p]rovided the State of destination does not object, the present Convention shall not interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad." *Charych v. Siriusware, Inc.*, No. CV 17-468 (JS) (GRB), 2018 WL 4870906, at *3 (E.D.N.Y. July 30, 2018) (quoting *Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986)). As a result, the Second Circuit has interpreted Article 10(a) as permitting "service of process by registered mail" where the receiving country has not objected to the use of postal channels under the Convention. *See Ackermann*, 788 F.2d at 839. The Supreme Court has recently agreed with this position and has explained that "in cases governed by the [Hague Convention], service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017).

The parties do not dispute that Plaintiffs complied with the service requirements set forth in the state court's order to show cause. In light of prevailing Second Circuit case law and the Supreme Court's decision in *Water Splash*, it appears that Plaintiff's overnight delivery was a satisfactory mechanism to pursue service under the Hague Convention. However, because "service by mail" must also have been "authorized under otherwise-applicable law," *see Water Splash, Inc.*, 137 S. Ct. at 1513, service through this method must have also comported with New York law.

Under New York law, "[p]ersonal service upon a natural person" may be made "in such manner as the court, upon motion without notice, directs, if service is impracticable

- 14 -

under paragraphs one, two and four of this section." CPLR 308(5).[3] During oral argument Plaintiffs explained that there existed no transcript or any other record demonstrating that those three customary methods of service were found to be impracticable by the state court. Indeed, according to Plaintiffs' attorney's declaration, it appears that the order to show cause papers were signed the same day they were provided to the state court judge without any formal hearing or record appearance. (Dkt. 10-1 at 5-6).

Defendants have asked this Court to reconsider the propriety of the service required by the state court order to show cause. At oral argument, Plaintiffs contended that Defendants squandered their opportunity to challenge the state court order by removing the action to federal court because only the New York State Appellate Division, and not a federal district court, can review a state court's decision to permit service pursuant to CPLR 308(5). Plaintiffs also argued that even if this Court could entertain Defendants' challenge, the state court's order should be interpreted as implicitly finding the other methods of service "impracticable" in light of the urgency of the requested relief.

"Upon removal, the orders entered by the state court are treated as though they had been entered by the federal court." *Nasso v. Seagal*, 263 F. Supp. 2d 596, 608 (E.D.N.Y.

---

[3]     Paragraphs one, two, and four of CPLR 308, provide for the delivery of a summons: (1) upon the person to be served; (2) upon a "person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served," together with a mailing to their "actual place of business"; and (3) "by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served" and mailing the summons to their "last known residence" or "actual place of business," where the methods of service described in paragraphs one and two cannot be fulfilled "with due diligence." *See* CPLR 308(1)-(2), (4).

2003); *see Snyder Corp. v. Fitness Ridge Worldwide, LLC*, No. 18-CV-351-FPG, 2018 WL 1428254, at *1 (W.D.N.Y. Mar. 22, 2018) ("A prior state court order in essence is federalized when the action is removed to federal court." (quoting *Resolution Tr. Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1316 (5th Cir. 1992))). In other words, "[a]fter removal, interlocutory orders of the state court are transformed into orders of the court to which the case is removed." *In re Diet Drugs*, 282 F.3d 220, 231-32 (3d Cir. 2002). Moreover, 28 U.S.C. § 1450 "provides in relevant part that '[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.'" *Breedlove v. Cabou*, 296 F. Supp. 2d 253, 267 (N.D.N.Y. 2003) (quoting 28 U.S.C. § 1450); *see Nasso*, 263 F. Supp. 2d at 608 (stating that Section 1450 authorizes a federal court "to reconsider" a state court order issued prior to removal).

Because the state court's order to show cause was "federalized" at the time this action was removed to federal court, this Court is authorized to reconsider the propriety of that order under § 1450. In the case of a temporary restraining order, service of "the papers upon which it [is] based, and a notice of hearing for the preliminary injunction, shall be personally served in the same manner as a summons." CPLR 6313(b). To divert from the requirements of CPLR 308(1), (2), or (4) in favor of the "expedient service" permitted by CPLR 308(5), New York law generally requires that "some manner of showing be made that a customary method of service is 'impracticable'." *Abrams v. Lurie*, 176 A.D.2d 474, 475 (1st Dep't 1991).

Here, it is undisputed that no formal showing of impracticability was presented to the state court judge. Likewise, there is no transcript or any other record indicating that the state court found paragraphs one, two, and four of CPLR 308 impracticable such that service by court order was properly allowed pursuant to CPLR 308(5). While Plaintiffs contend the urgency of their application demonstrated that no other form of service was feasible, they have cited no case law supporting this argument and, moreover, have failed to establish that this consideration was the basis for the state court's decision to permit service by court order.

Furthermore, while a state court may allow service of a temporary restraining order and its supporting papers in a manner other than that required for service of the summons, *see* CPLR 6313(b), "it is generally recognized that this power is exercised only when a temporary restraining order is issued in the context of an already pending action," *Abrams*, 176 A.D.2d at 476. Here, it is unclear whether the state court's order to show cause was intended to apply to the initial service of the Summons and Verified Complaint or simply directed how the temporary restraining order was to be served. In other words, although Plaintiffs' papers supporting the original temporary restraining order included the Summons and Verified Complaint, the Court is not convinced that the generic language found in the order to show cause stretched so far as to encompass the service requirements customarily employed at the initiation of a state court action. Relatedly, while the order to show cause states that compliance with its service requirements "shall be deemed good and sufficient" service upon Defendants, substantive service errors "cannot be cured simply by adding language in the order to show cause specifically deeming service effective."

*Stephens v. N.Y. State Exec. Bd. of Parole Appeals Unit*, 297 A.D.2d 408, 410 (3d Dep't 2002).

Therefore, because Plaintiffs have failed to demonstrate that service under paragraphs one, two, or four of CPLR 308 was impracticable, service in accordance with the state court's order to show cause failed to effectuate proper service of the Summons and Verified Complaint.

### C. Plaintiffs' Mailing by Federal Express Failed to Effectuate Service

Plaintiffs further contend that service was executed by serving Defendants "by Federal Express, overnight delivery on December 7." (Dkt. 14 at 10). However, the CPLR does not "permit service of a summons and complaint by simply mailing a copy to a defendant via the U.S. Postal Service or an express delivery service." *Fairman v. Hurley*, 373 F. Supp. 2d 227, 232 (W.D.N.Y. 2005); *see Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP*, No. 1:17-CV-0034 (FJS/DEP), 2017 WL 7411022, at *5 (N.D.N.Y. Mar. 23, 2017) ("Although plaintiffs contend that defendant Darshan-Leitner was served the state court summons, complaint, and order to show cause issued by the New York State Supreme Court Justice Ryba by Federal Express, such service of process does not comply with [CPLR 312-a], which provides for service by mail." (citations omitted)), *report and recommendation adopted*, 2017 WL 3130415 (N.D.N.Y. July 24, 2017); *Olympus Corp. v. Dealer Sales & Serv., Inc.*, 107 F.R.D. 300, 305 (E.D.N.Y. 1985) (stating that "New York law does not expressly authorize service by an express delivery service such as Federal Express"). "Although New York state law allows a plaintiff to attempt service by mail, such service is not effective unless the defendant signs and returns an acknowledgment of

receipt." *Fairman*, 373 F. Supp. 2d at 232 (quotation and citations omitted); *see* CPLR 312-a(a)-(b) (permitting service by "first class mail, postage prepaid," but such service is only deemed "complete on the date the signed acknowledgment of receipt is mailed or delivered to the sender"); *Krasa v. Dial 7 Car & Limousine Serv., Inc.*, 147 A.D.3d 744, 745 (2d Dep't 2017) ("The defendants were not properly served by mail pursuant to CPLR 312-a, since it is undisputed that the plaintiff failed to send, inter alia, copies of acknowledgments of receipt in the form set forth in CPLR 312-a(d) to the defendants, and there is no evidence that any acknowledgment was completed and mailed or delivered to her attorney.").

Here, there is no evidence that Plaintiffs sent or that Defendants returned an acknowledgement of receipt in compliance with CPLR 312-a. Indeed, Plaintiffs' counsel candidly conceded as much during oral argument. Accordingly, Plaintiffs' Federal Express mailing does not establish sufficient service under New York law.

D.     **Service by Canadian Process Server May Have Effectuated Service Upon Bryan DiFrancesco But Seems to Have Failed to Effectuate Service Upon Natascha DiFrancesco**

Finally, Plaintiffs claim that they satisfied their service obligations by hiring "a Canadian process server to personally serve [Defendants]. . . ." (Dkt. 14 at 11). The process server purportedly "completed personal service on [Defendants] at their place of business on December 14, 2018." (*Id.*). Defendants argue that Plaintiffs' process server did not effectuate service because Plaintiffs were required to execute service through a "Central Authority" in order satisfy the Hague Convention. (Dkt. 18 at 6 n.3).

- 19 -

"The primary means by which service is accomplished under the Convention is through a receiving country's 'central authority' designated to receive requests for service of documents from other countries." *CGC Holding Co., LLC v. Hutchens*, No. 11-CV-01012-WYD-KLM, 2011 WL 2559807, at *2 (D. Colo. June 28, 2011) (citation omitted); *see Marcus Food Co. v. Dipanfilo*, No. CIV. 09-1261-EFM, 2010 WL 3946314, at *3 (D. Kan. Oct. 5, 2010) ("The primary method of service is for a party to mail process to the Central Authority, and the Central Authority then effects service on the individual or corporation according to local law." (footnote omitted)), *aff'd*, 671 F.3d 1159 (10th Cir. 2011); *see generally United States v. Islip*, 22 C.I.T. 852, 859 (1998) ("Each signatory country is required to establish a central authority to receive requests from other countries for service of judicial documents.").

> Once a central authority receives a request in the proper form, it must serve the documents by a method prescribed by the internal law of the receiving state or by a method that the sender requests, provided that the method is compatible with local law. The central authority then provides the sender with a certificate of service that conforms to a specified model.

*Islip*, 22 C.I.T. at 859 (citations omitted).

Nevertheless, service through a central authority "is not the exclusive approved method of service under the Convention." *CGC Holding Co., LLC*, 2011 WL 2559807, at *2; *see Jerge v. Potter*, No. 99-CV-0312E(F), 2000 WL 1160459, at *1 (W.D.N.Y. Aug. 11, 2000) ("The Hague Convention requires service through a 'Central Authority' *or* by other means if the 'State of destination does not object.'" (citation omitted) (emphasis added)); *Marcus Food Co.*, 2010 WL 3946314, at *3 (explaining that "service of process may also be effected in other ways and may be effected informally provided that the

country does not object to that method"); *see also The Haskell Co. v. Radiant Energy Corp.*, No. 05-CV-04403 (DLI) (MDG), 2007 WL 2746903, at \*6 (E.D.N.Y. Sept. 19, 2007) (stating that the Hague Convention "allows service to be accomplished through a central authority in Canada or in compliance with Canadian procedures, so long as Canada does not specifically object to the use of those procedures").

"Article 10 of the Convention provides that 'judicial officers, officials, or other competent persons of the State of destination' may serve a summons, '[p]rovided the State of destination does not object.'" *F.T.C. v. 1492828 Ontario, Inc.*, No. 02 C 7456, 2003 WL 21038578, at \*2 (N.D. Ill. May 7, 2003) (citation omitted); *see CGC Holding Co., LLC*, 2011 WL 2559807, at \*2. "Canada has not availed itself of the opportunity . . . to object to Article 10(b)'s service provision." *Dimensional Commc'ns, Inc. v. OZ Optics Ltd.*, 218 F. Supp. 2d 653, 656 (D.N.J. 2002); *see Walton v. Bilinski*, No. 2:15 CV 36 CDP, 2015 WL 9489610, at \*2 (E.D. Mo. Dec. 30, 2015) ("Canada has declared no opposition to the method of service of process provided in 10(b)."); *Marcus Food Co.*, 2010 WL 3946314, at \*4 ("Canada has not objected to service under Article 10(b) and affirmatively states that it will not object to service under Article 10(b)."). "If a destination state has no objection to service of process under 10(b), then courts look to the 'internal service rules of the destination State to determine whether that State would object to the particular method of service utilized under Article 10.'" *Walton*, 2015 WL 9489610, at \*2 (quoting *Marcus Food Co.*, 2010 WL 3946314, at \*4); *see Dimensional Commc'ns, Inc.*, 218 F. Supp. 2d at 656 (same).

"The federal system of Canada requires examining the law of the Province of Ontario." *Jerge*, 2000 WL 1160459, at *1; *see also The Haskell Co.*, 2007 WL 2746903, at *6 (stating that where the plaintiff "chose to hire a process server and serve [the defendant corporation] personally[, t]he issue then becomes whether such service comports with the procedural requirements of the Province of Ontario"). "The applicable Ontario rule of civil procedure is Rule 16 regarding Service of Documents." *Dimensional Commc'ns, Inc.*, 218 F. Supp. 2d at 656. "With respect to Ontario's civil procedure rules for serving an individual, it provides that where a document is to be served personally, 'the service shall be made on an individual, other than a person under disability, by leaving a copy of the document with the individual.'" *Marcus Food Co.*, 2010 WL 3946314, at *4 (quoting Ontario Rules of Civil Procedure R.R.O. 1990, Reg. 194 § 16.02(1)(a)).

Plaintiffs submit two affidavits pertaining to the purported service of the Summons and Verified Complaint on December 14, 2018. (Dkt. 10-9). In the first affidavit, John Patrick James McGrinder ("McGrinder") averred that he served the Summons and Verified Complaint upon Bryan DiFrancesco at his place of business on December 14, 2018, "by delivering a true copy of the aforesaid documents personally" while at the "Active Body Clinic" in Ontario. (*Id.* at 2). In the second affidavit, McGrinder averred that he served the Summons and Verified Complaint upon Natascha DiFrancesco "by Substitute Service upon Bryan DiFrancesco" who "accepted service for his wife" while at the Active Body Clinic. (*Id.* at 3).

McGrinder's first affidavit of service creates a presumption that service was properly effectuated upon Bryan DiFrancesco. *See Onewest Bank N.A. v. Elliott*, No. CV

- 22 -

15-4395 (JS)(ARL), 2016 WL 3766062, at *2 (E.D.N.Y. May 23, 2016) ("It is well established that a process server's affidavit of service establishes a presumption that service is proper." (citing cases)), *report and recommendation adopted*, No. 15-CV-4395(JS)(ARL), 2016 WL 3746564 (E.D.N.Y. July 8, 2016). "A defendant's sworn denial of receipt of service . . . rebuts the presumption of proper service established by the process server's affidavit and necessitates an evidentiary hearing." *Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002). Both Bryan and Natascha DiFrancesco have submitted sworn denials only to having received *sufficient* service. (*See* Dkt. 3-8 at ¶ 56 ("With regard to the civil action, my wife and I have never been properly served a copy of the verified complaint."); Dkt. 3-12 at ¶ 12 ("In addition, given that I do not work at my husband's place of business, any service at that location was completely improper.")). Nonetheless, neither affidavit provides "specific facts" refuting McGrinder's averment that he personally served the Summons and Verified Complaint upon Bryan at his place of business. *See Old Republic Ins. Co.*, 301 F.3d at 58 ("[N]o hearing is required where the defendant fails to swear to 'specific facts to rebut the statements in the process server's affidavits.'" (quoting *Simonds v. Grobman*, 277 A.D.2d 369, 369 (2d Dep't 2000))). Since McGrinder was a "competent person"[4] pursuant to Article 10(b) of the

---

[4]     Article 10(b) requires that service be executed by a "competent person." Nonetheless, "[n]either the Convention nor Ontario law defines competency in the context of service of process." *1492828 Ontario, Inc.*, 2003 WL 21038578, at *2. However, "numerous courts have found personal service by a process server under Articles 10(b) and (c) to be valid in other States[,]" and "[n]o court holds service under Article 10(b) by a process server invalid in Canada." *Dimensional Commc'ns, Inc.*, 218 F. Supp. 2d at 659 (citation omitted); *see also Islip*, 22 C.I.T. at 862 ("Canada's internal laws are themselves flexible about who is authorized to affect service of process. The laws of Ontario governing

Hague Convention,[5] and because the Summons and Verified Complaint were left with Bryan at his place of business, Article 10(b) and Ontario's Rules of Civil Procedure seem to be satisfied and service upon Bryan appears to have been properly effectuated.[6]

Although McGrinder's second affidavit of service indicates that another copy of the Summons and Verified Complaint was left with Bryan on Natascha's behalf, it does not appear that this act complied with the service requirements outlined in Ontario's Rules of Civil Procedure. Certainly, McGrinder did not leave "a copy of the document [to be

---

service of process do not proscribe government officials or even private persons from effecting service of process."). Accordingly, because McGrinder has affirmed that he was over 18 years old at the time he effected service and is not a party to this action, he was a "competent person" to serve process under Article 10(b) of the Hague Convention. *See 1492828 Ontario, Inc.*, 2003 WL 21038578, at *2 ("Taking an expansive view of Canadian law, and considering United States precedent Ms. Czerniak would be 'competent' by virtue of being over the age of 18 and not a party to [the d]efendant's case."); *Islip*, 22 C.I.T. at 862 (finding a process server who was a non-party and over eighteen years old to be a "competent person").

[5]     To the extent *Greater Ministries Int'l* interpreted *Islip* as requiring that both Article 10(b) and (c) be met for service process to be satisfactorily effectuated under the Hague Convention, *see Greater Ministries Int'l, Inc.*, 282 B.R. at 500 ("*Islip* also stands for the proposition that service *must additionally* comply with Article 10(c) of the Hague Convention, which provides that '. . . any person interested in a judicial proceeding . . .' may effect service." (emphasis added)), the Court disagrees. *Islip* concluded that "[s]ervice of process in this case conformed to *two of the alternate methods* of service found in Article 10 of the Convention," 22 C.I.T. at 860 (emphasis added), and analyzed whether service had been separately effectuated under both provisions, *id.* at 860-63; *see Water Splash, Inc.*, 137 S. Ct. at 1508 ("Articles 10(b) and 10(c), by their plain terms, address *additional methods of service* that are permitted by the Convention (unless the receiving state objects)."). In other words, what *Greater Ministries Int'l* found as joint requirements, are actually two distinct methods of service permitted by the Convention in the absence of an objection by the receiving country.

[6]     New York law also appears to have been satisfied because the Summons and Verified Complaint were personally delivered to Bryan DiFrancesco. *See* CPLR 308(1).

served] with *the* individual" being served. *See* Ontario Rules of Civil Procedure R.R.O. 1990, Reg. 194 § 16.02(1)(a) (emphasis added). Notably, McGrinder's affidavit indicates that by leaving the Summons and Verified Complaint with Bryan DiFrancesco, he affected "Substitute Service" upon Natascha DiFrancesco. (Dkt. 10-9 at 3). As an initial matter, there is no indication that substitute service was authorized by an appropriate judicial tribunal in this instance. Indeed, the Ontario Rules for Civil Procedure set forth a procedure to obtain authorization for substitute service through judicial sanction. *See* Ontario Rules of Civil Procedure R.R.O. 1990, Reg. 194 § 16.04(1) ("Where it appears to the court that it is impractical for any reason to effect prompt service of an originating process or any other document required to be served personally or by an alternative to personal service under these rules, the court may make an order for substituted service or, where necessary in the interest of justice, may dispense with service."). Furthermore, Rule 16 of Ontario's Rules of Civil Procedure does not appear to permit service upon an individual by leaving the documents with that person's spouse at the spouse's place of business. *See id.* § 16.03 (setting forth alternatives to personal service); *see generally Ryan (In Trust) v. Kaukab*, [2004] O.J. No. 5656 (Can. Ont. S.C.J.) (Q.J.) ("Service on a husband is not service on the wife regardless of how far the wife has in the past delegated business and legal matters to the husband.").

"On a motion to dismiss pursuant to Rule 12(b)(5) for deficient service of process, 'the plaintiff bears the burden of establishing that service was sufficient.'" *Sikhs for Justice v. Nath*, 850 F. Supp. 2d 435, 440 (S.D.N.Y. 2012) (quoting *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010)). By failing to demonstrate how McGrinder's purported

"Substitute Service" upon Bryan effectuated service upon Natascha pursuant to Ontario law, Plaintiffs have failed to carry this burden.

### E.     Additional Briefing is Required

The Court recognizes that neither side has briefed whether Ontario's service requirements were satisfied. The Court's initial review of the relevant procedural rules suggests that they were not, at least as those rules pertain to Natascha DiFranscesco. The resolution of this issue is vital to the disposition of the pending motions. Indeed, it appears that Natascha purchased both properties at issue and may claim some ownership interest therein. (*See* Dkt. 3-8 at ¶ 4 ("My wife owns the Properties, which are located in the area known as the Sunset Area Subdivision of Holimont, a residential community of 17 properties."); Dkt. 3-12 at ¶¶ 4-5 (averring that Natascha is "an owner" of property within the subdivision and that she "purchased the Properties as a family vacations home to use with [her] husband and [their] three children")). In fact, Plaintiffs' Verified Complaint alleges that she "shares common law ownership" of both properties with Bryan DiFrancesco. (*See* Dkt. 1-2 at 5 (alleging that Natascha "is the owner" of the two subject properties, and "shares common law ownership" over those lots with her husband)). Because Natascha holds a significant ownership interest in each property, the Court is likely unable to grant complete relief, should Plaintiffs ultimately prevail, if Natascha is dismissed from this action. *See* Fed. R. Civ P. 19(a). Furthermore, several cases have denied preliminary injunction motions for the failure to demonstrate a likelihood of success on the merits where a necessary party has not been joined. *See, e.g., Ram v. Lal*, 906 F. Supp. 2d 59, 79 (E.D.N.Y. 2012) ("[T]he Court finds that the State Court and the Receiver

are necessary parties to the action and must be before this Court in order to effectuate the requested injunction."); *Westchester Disabled On the Move, Inc. v. County of Westchester*, 346 F. Supp. 2d 473, 480 (S.D.N.Y. 2004) (denying motion for a preliminary injunction because where "[t]he currently named [d]efendants could not provide complete relief sought by [p]laintiffs . . . [the p]laintiffs cannot establish a likelihood of success on the merits"); *Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*, No. 03 CIV. 493 (RWS), 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of . . . a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure, the merits may not be reached and a preliminary injunction may not be granted."); *Shenandoah v. U.S. Dep't of Interior*, No. 96-CV-258(RSP/GJD), 1997 WL 214947, at *3 (N.D.N.Y. Apr. 14, 1997) ("Plaintiffs' failure to join the Oneida Nation [as an indispensable party] also disposes of their preliminary injunction motion, because plaintiffs cannot show a likelihood of success on the merits of their lawsuit."), *aff'd*, 159 F.3d 708 (2d Cir. 1998); *see also KM Enters., Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 540955, at *6 (E.D.N.Y. Feb. 16, 2012) ("Although a determination of whether the Plaintiff has failed to join necessary parties is not necessary for purposes of a preliminary injunction because the motion is adequately dismissed on alternative grounds, the Court notes that it was ultimately proper and reasonable . . . to consider this factor at this stage of the proceedings.").

Accordingly, the Court will hold both Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss in abeyance pending further briefing on the limited issue of whether McGrinder's service of the Summons and Verified Complaint effectuated service upon Natascha DiFrancesco in full compliance with the Convention and New York

law.  As such, the Court orders Plaintiffs to submit supplemental briefing addressing this issue within two weeks of the date of this Decision and Order.  Defendants will have one week to file a supplemental response to Plaintiffs' additional briefing.  Upon receipt of all papers, the Court will determine whether additional oral argument and/or an evidentiary hearing is necessary to dispose of the remaining aspects of both motions.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 3) is denied in part, but is otherwise held in abeyance along with Plaintiffs' motion for a preliminary injunction (Dkt. 1-3 at 5-184) until further briefing has been submitted as directed above.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:     April 15, 2019
           Rochester, New York